FARMERS CASUALTY COMPANY (MU-
TUAL), a corporation, Appellant,

v.

Robert GREEN and Fred W. Surridge,
Appellees.

Robert GREEN, Cross-Appellant,

v.

FARMERS CASUALTY COMPANY (MU-
TUAL), a corporation, Cross-Appellee.

Nos. 9633, 9634.

United States Court of Appeals
Tenth Circuit.

March 4, 1968.

James D. Howell, Kansas City, Kan.,
and Murvyl Sullinger, Pittsburgh, Kan.
(James Yates, Kansas City, Kan., on the
brief), for appellant.

John E. Shamberg, Kansas City, Kan.
(Charles S. Schnider, Jacob F. May, Jr.,

and Edward G. Collister, Jr., Kansas City, Kan., on the brief), for Robert Green.

Jack L. Goodrich, Parsons, Kan., on the brief for Fred W. Surridge.

Before LEWIS, SETH and HICKEY, Circuit Judges.

DAVID T. LEWIS, Circuit Judge.

This is a declaratory judgment action, 28 U.S.C. § 2201, brought by the insurer, Farmers Casualty Company, against its insured, Green, and joining Surridge, a plaintiff in a Kansas state court action now pending in which recovery for personal injuries suffered in a farm accident is sought against the insured as defendant. Farmers sought a declaration that it had no obligation to its insured or liability under its policy because of a breach by the insured of the cooperation clause of the insurance contract.[1] The insured, Green, counterclaimed for expenses and attorneys' fees incurred in defense of the declaratory proceedings. Trial was to the court and resulted in judgments adverse to Farmers upon its complaint and to Green upon the counterclaim. Each appeals.

In 1960, Farmers issued to Green an insurance contract known as a Comprehensive Farm Liability Policy. The policy was renewed from year to year and was in full force and effect on August 14, 1965, when Surridge was injured in attempting to repair a hay baler while working for Green at Green's farm in Crawford County, Kansas. Surridge, a nephew of Green, lived in Labette County, and Green resided in Cherokee County. Under Kansas law, venue for any action Surridge might have could be properly laid in any of the three counties which are adjacent one to the other.

■■ The determination of cooperation between an insured and his in-surer primarily presents a question of fact and the inferences to be drawn therefrom, and as such is a basic problem for the trier of the fact, here the court. Commercial Standard Ins. Co. v. Readnour, 10 Cir., 241 F.2d 14, 17, 79 A.L.R.2d 1036. Our appellate consideration is thus limited to a review of the sufficiency of the evidence to support the trial court's ultimate finding and conclusion that the acts of the insured did not here constitute a lack of cooperation.

■ Farmers' claim to a failure of cooperation by the insured has four facets in fact: Green discussed the case with the injured party, Surridge; Green submitted to service of process in Labette County, the residence of Surridge; Green, through his remarks and attitude, exhibited hostility toward Farmers' counsel during investigation of the case; Green, acting through his own counsel and during the trial of the instant case, filed papers in the state court action that were adverse to Farmers' claims in the state case. We are in thorough agreement with the trial court that the permissible inferences to be drawn from these facts do not dictate a lack of cooperation and fairly lead to the entry of the judgment below.

It would indeed be unnatural if Green had not discussed the accident and the fact of insurance with Surridge. The two men are relatives, neighbors, and friends and after the accident Green called on Surridge, in the hospital and at home, twice a week for several weeks. Many policies of insurance are purchased for the very purpose of protecting friends and relatives and it would be a harsh rule of law that inhibited the decencies of human conduct after the occurrence of the dreaded mishap. Moreover, this record reveals no more of the Green-Surridge discussions than a statement by

1. "ASSISTANCE AND COOPERATION OF THE INSURED—COVERAGES A, E, F: The insured shall cooperate with the Company and, upon the Company's request shall attend hearings and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses and in the con-duct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of accident."

Surridge that he might have to sue and Green's reply: "That's your privilege."

On October 1, 1966, both the Greens[2] and the Surridges were invited to come to a birthday dinner on October 4 at the home of Mr. and Mrs. Vance who resided near the town of Parsons in Labette County. At about 4:00 a.m. on October 3, Surridge came to the home of Green, awakened him, and inquired whether Green would be at the Vances' home on October 4. Green answered that he would and Surridge then told Green that the sheriff would serve papers on him at that time. Green did attend the dinner and was served with process in the state court action.

On October 6, counsel for Farmers accompanied by a court reporter interviewed Green while the latter was working in his fields. In response to questions, Green described the circumstances of the accident and the injuries to Surridge; told of his relationship with Surridge and the fact that they had discussed the case; and disclosed the early morning visit of Surridge on October 3 during which he learned that papers would be served on October 4 at the Vances' home. Green said nothing about having been earlier invited to the Vance home for social reasons but as he testified at trial: "I was not asked." During this interview nothing transpired that could indicate any hostility upon the part of Green toward the insurer.

On October 11, counsel for Farmers, again accompanied by a court reporter, called at the Green home and talked with Green, Mrs. Vance and Miss Green. During and after this interview Green did indeed show what the trial court termed a "marked animosity" toward Farmers, "stemming from a misunderstanding on Green's part as to the nature of the plaintiff's [Farmers] obligation under the contract. * * *"[3] From our review of the entire transcription of this interview we consider Green's attitude not only to be understandable but justifiable.

The interview took place at night on Green's front porch and had as its purpose the attaining of Green's signature to a Non-Waiver Agreement and Reservation of Rights and an affidavit formalizing Green's earlier statements concerning his knowledge that he would be served at the Vances' home. The interview opened with a statement by Sullinger, Farmers' attorney, after identifying himself, thus:

"Q. Now, Mr. Green, I will hand you a non-waiver agreement and ask you to read that over carefully, and after you have read it over, sign on the line marked 'First Party.' I want you to read this over first, and if you have any questions, feel free to ask me. * * *"

Green and his two relatives took the papers into the house (Sullinger was invited in but did not go) and Mrs. Vance read the papers to Green. After an unreported discussion in the house, Green and the others returned to the porch and an extended discussion ensued and was recorded. We can but abstract and summarize the conversation.

Neither Green nor the women could understand the import of the non-waiver and Sullinger's attempts to explain to them the legal limitations inherent in the document led only to distrust on Green's part and a growing knowledge that all was not well between Farmers and him.[4] And during the interview Green made the following statements upon which the insurer now relies as an element of non-cooperation under the policy.

MR. GREEN: "They [referring to the Insurance Company] haven't got any rights."

2. Green is a bachelor and lives with his unmarried sister. Mrs. Surridge is a sister of Mrs. Vance and a niece of Green. The three families frequently had dinner together at one home or another.

3. At one point in the interview Green said: "* * * it is like hail insurance or anything else—when you have hail you expect them to pay. Isn't that the way it works?"

4. Although Green's understanding may have been dull his instinct was not. This action was filed three days later.

MR. GREEN: "What kind of rights would they have? Hell, only rights you got, when you lose is to pay it."

MR. GREEN: "It means you are trying to get out of it. Isn't that what it means? Wiggle out of it anyway you can. Now you are stuck."

MR. GREEN: "And they don't want to pay it—well, they wouldn't have to pay near that much, Jesus Christ—they could settle with him if they tried."

These statements, as the trial court noted, did not breed cooperation. But neither did the situation itself. Sullinger had stated that the insurance company would not proceed until the non-waiver was signed. Then,

"MR. GREEN: why wouldn't they proceed? They don't owe it?

MR. SULLINGER: No.

MR. GREEN: What is holding them up anyhow?

MR. SULLINGER: The possibility that the insurance contract has been violated by non co-operation.

MR. GREEN: Never been violated that I know of. He seems to be happy about it. He comes here and sells me every year.

MRS. VANCE: He seems to think you have violated it, Bob.

MR. GREEN: How have I violated it?

MR. SULLINGER: Failure to co-operate.

MR. GREEN: I told you everything I know—what am I supposed to do? You are not explaining it very good. No, before I sign this I am going to have somebody explain it to me a little better than this. I can't see any reason for it in the first place.

MR. SULLINGER: I told you a minute ago, Mr. Green, this is very urgent, but I would like for you to consult your own attorney and go over this non-waiver agreement. Only thing I ask, you have it in my office to-morrow, if possible."

And although both Green and Mrs. Vance several times asked how a violation by non-cooperation had occurred they received no responsive answer.

The next day Green consulted an attorney (not present counsel) and was advised not to sign the documents. He so informed counsel for Farmers.

Against this factual background the insurer asserts its claim of non-cooperation and in support thereof relies primarily on this court's decision in Elliott v. Metropolitan Casualty Ins. Co. of New York, 250 F.2d 680, 66 A.L.R.2d 1231. We think the cases are clearly distinguishable. In *Elliott* the insured "had consulted with opposing counsel, agreed to lend himself to that attorney's desires, did so, and then falsely testified concerning the arrangement in order to hide the collusion." 250 F.2d at 683. In the case at bar Green had never talked to Surridge's counsel, did not know him, and fully disclosed to the insurer all he knew about the accident and his relationship and contacts with the injured Surridge. As we specifically stated in *Elliott* the basic purpose of the cooperation clause is to eliminate connivance between the insured and the claimant; and acts of insured, even affirmative in nature, which do not materially threaten the insurer's rights do not constitute a contract breach. 250 F.2d at 683. The extreme of Green's conduct consisted of being present at the Vance house knowing that he would there be served with process. He did not affirmatively avoid that event and as a result the insurer would be subjected to a trial laid in the county of the claimant's residence, a result the insurer might well consider undesirable. Prejudice, however, does not follow as a matter of law and, in this case, there is no showing that prejudice resulted as a fact. Certainly Green was not obligated to isolate himself in the county of his own residence and both his personal and business affairs took him into Labette County on numerous occasions. Service in Labette County was not dependent on Green's deliberate appearance on the night of October 4.

Appellant does not contend that Green had any obligation to sign the documents presented to him but projects the quoted remarks of Green made on that occasion through "insight" to the conclusion that the insurance carrier would now "never be able to obtain a fair trial of the action." Such a conclusion presupposes untruthfulness from Green as a witness, an anticipation not dictated from this record and one we will not make.

While the trial of this case was in progress counsel for Farmers filed a motion in the Kansas state court to quash service. The motion, made in the name of Green as defendant, alleged that Green and Surridge had fraudulently conspired together to invoke state process and were conniving in shopping for a forum. Green, acting through independent counsel, then filed a motion to strike such motion, stating that the motion to quash was made without his knowledge and consent, did not reflect his interests but opposed them, and in fact was the act of Farmers. The motion called the attention of the state court to the controversy existing between Green and the insurance company in federal court and asked for special relief of a varied nature. These motions are pending in state court and we consider them only because appellant asserts the state proceedings constitute an act of non-cooperation. We think it sufficient to state that such a contention is patently without merit under the totality of circumstances here present.

By cross-appeal, Green asserts the trial court erred in not allowing him judgment for special expenses and attorneys' fees incurred in the defense of this action. This position has initial appeal for certain it is that the insurer has utilized the Declaratory Judgment Act to determine its duty to defend and, as one commentator puts it, "has done by indirection that which it could not do directly." [5] However, under Kansas law and traditionally, attorneys' fees can be awarded only if provided for by contract or authorized by statute. Kansas has consistently interpreted its applicable statute [6] as limited to those cases where an insurance company has wrongfully refused to pay. Barnes v. Mid-Continent Casualty Co., 192 Kan. 401, 388 P.2d 642; Wolf v. Mutual Benefit Health & Accident Ass'n, 188 Kan. 694, 366 P.2d 219. Farmers has not here refused to pay. And although attorneys' fees in a declaratory judgment action have been allowed as a contractual right [7] where the carrier had refused to defend, Connecticut Fire Ins. Co. v. Reliance Ins. Co. of Madison, Wis., 10 Cir., 208 F.Supp. 20, the substance of the suit was that of non-payment. Here, Farmers is still engaged in the defense of the state case and we agree with the trial court that the contract language cannot be so liberally construed as to include the defense of this action as an expense incurred at the request of the insurer under the contract.

The judgments are severally affirmed.

5. Appleman, Insurance Law and Practice, Vol. 7A, sec. 4691, p. 513.

6. K.S.A. 40–256, which provides in part: "That in all actions hereafter commenced, in which judgment is rendered against any insurance company * * * on any policy * * * of insurance, if it appear from the evidence that such company * * * has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs: * * *."

7. The contract provides that the insured shall be reimbursed "for all reasonable expenses, other than loss of earning, incurred at the Company's request."