**OAKVIEW TREATMENT CENTERS OF KANSAS, INC., Plaintiff,**

v.

**James W. GARRETT, Sr. and Bonita J. Garrett, Defendants.**

**No. CIV. A. 98–2164–KHV.**

United States District Court, D. Kansas.

June 24, 1999.

Reid F. Holbrook, Holbrook, Heaven & Osborn, P.A., Kansas City, KS, Thomas S. Busch, Kurt S. Brack, Holbrook, Heaven & Osborn, P.A., Merriam, KS, for Plaintiff.

Mark G. Flaherty, J. Bradley Leitch, Sonnenschein, Nath & Rosenthal, Kansas City, MO, for Defendants.

### *MEMORANDUM AND ORDER*

VRATIL, District Judge.

Plaintiff Oakview Treatment Centers, Inc. ("Oakview") brings suit to enforce an indemnity agreement, claiming that defendants have refused to pay. On June 14 and 15, 1999, Oakview tried its case to the Court. For reasons set forth more fully below, the Court finds that Oakview is entitled to judgment in this case.

#### Findings of Fact

Consistent with the evidence presented at trial, which consisted primarily of stipulations, the Court makes the following findings of fact.

In early 1991, James Garrett and Bonita Garrett were the sole owners of Garrett & Associates, Inc. ("GAI"). On February 5, 1991, GAI filed an involuntary bankruptcy

petition against Bernard Glannon. In due course, Glannon answered the involuntary petition by alleging that he was paying his debts as they became due and that GAI had acted in bad faith in filing the petition as the sole petitioning creditor. Glannon alleged that GAI knew or should have known that Glannon had more than twelve creditors and that bankruptcy law required three creditors to bring the petition.

In a letter dated March 8, 1991, Glannon's attorney informed Glannon's creditors about pending litigation, the filing of the involuntary petition, an order granting relief from the automatic stay, and Glannon's defenses to the involuntary petition. The letter expressly cautioned all creditors about joining the involuntary petition because damages and costs could be awarded against them if the petition was dismissed and found to have been filed in bad faith.

On April 25, 1991, the bankruptcy court set a deadline of May 7, 1991 for GAI to add two additional creditors to its involuntary petition. Around May 1, 1991, Cheryl Myers, attorney for GAI, asked Oakview to join the involuntary petition. Around May 3, 1991, Oakview first received a copy of Glannon's letter to creditors of March 8.[1]

On May 7, 1991, defendants and GAI executed an indemnification agreement in favor of Oakview.[2] Consequently, on May 7, 1991, at GAI's request, Oakview filed a motion to join as petitioning creditor in the involuntary petition against Glannon. On May 15, 1991, Maxim, another creditor, also joined the involuntary bankruptcy proceeding.

The indemnification agreement states, in its entirety, as follows:

The undersigned shall indemnify, protect, defend, and save harmless Oakview Treatment Centers of Kansas, Inc. a Kansas Corporation and its affiliates (Indemnitee) from and against any and all claims, demands, liabilities, and costs arising from damage or injury, actual or claimed, of whatever kind or character, arising out of Indemnitee's participation as a petitioning creditor in a certain case before the United States Bankruptcy Court for the District of Kansas at Topeka styled *In Re: Bernard D. Glannon* Case No. 91–40230–7. Upon notice from Indemnitee, the undersigned shall defend the Indemnitee in any action or proceeding brought thereon, including all attorney's fees and expenses. Without limiting the generality of the above, it shall be the responsibility of the undersigned to indemnify the Indemnitee in relationship to any contingent liabilities, whether known or unknown, affecting this indemnification.

On May 4, 1992, the bankruptcy court dismissed the involuntary petition against Glannon because the petitioning creditors had failed to prove that Glannon was generally not paying his debts as they became due. The bankruptcy court further found that GAI had filed the petition in bad faith and that Oakview had joined in bad faith. Therefore, while it dismissed the involuntary petition against Glannon, it retained jurisdiction over Oakview and ordered GAI, Oakview and their attorneys to show cause why damages and sanctions should not be awarded against them. The bankruptcy court specifically found that before Oakview joined the bankruptcy proceeding, it had received the letter from Glannon's counsel, warning that the bankruptcy had been filed for an improper purpose, advising that Glannon had defenses, and noting the consequences of joinder if the bankruptcy court found that the petition had been filed in bad faith. The court also noted that Oakview had violated the automatic stay provision of the Bankruptcy Code by trying to extract a payment from Glannon when the bankruptcy case was pending and the automatic stay was in

---

**1.** The record does not reveal the cause for the delay.

**2.** David Carpenter, an attorney for defendants, drafted the indemnification agreement.

effect, and that Oakview had failed to bill Glannon for the debt on which it based its claim in the bankruptcy and acquiesced in his attempts to have the debt paid by insurance.

While Maxim also joined the involuntary petition, it had not attempted to extract a settlement from Glannon in violation of the automatic stay. Nor had it failed to bill Glannon for the debt on which it based its claim in bankruptcy, or acquiesced in Glannon's efforts to obtain payment from a third party. The bankruptcy court found that Maxim had joined the involuntary bankruptcy proceeding in the face of the previously mentioned letter from Glannon's counsel. Despite this finding, the bankruptcy court did not hold that Maxim had joined the petition in bad faith. Rather, it found that the Maxim representative who received the letter was not an attorney and it was unclear whether he knew what was going on.

On May 19, 1992, Oakview (through counsel David A. Welte of Polsinelli, White, Vardeman & Shalton) made written demand upon GAI and defendants to

> indemnify and save harmless Oakview Treatment Centers of Kansas, Inc. from and against any claims, demands, liabilities, and costs arising from damage or injury arising out of Oakview's participation as a petitioning creditor in the captioned matter, as well as all other duties and obligations Garrett owes to Oakview pursuant to the terms and conditions of the Indemnification Agreement.

Oakview did not specifically ask defendants to defend it under the indemnification agreement; instead, it specifically sought separate representation.

On May 28, 1992, through counsel Michael B. Myers, defendants refused to indemnify Oakview for any costs or liability for any action taken by Oakview before or concurrently with the joining of the involuntary petition. Myers took the position that the indemnification agreement did not cover such costs because the bankruptcy court had retained jurisdiction over Oakview based on its actions *before* it participated in the bankruptcy proceeding and not based on its participation *in* the proceeding. Myers stated

> If you will review both the Journal Entry of May 4, 1992, and the actual transcript of the proceedings on that date you will find that the Judge found bad faith on the part of Oakview Treatment Centers for matters relating to actions they took *before* they joined as a petitioning creditor. Neither the Garretts personally nor Garrett & Associates, Inc. is obligated to indemnify and hold harmless Oakview for any action taken by Oakview before or concurrently with the joining of the involuntary petition.

On January 20, 1993, Glannon filed suit against Oakview (and others) for malicious prosecution of the involuntary bankruptcy petition.[3] Glannon did not name Maxim as a defendant in the malicious prosecution action.

In a letter dated June 21, 1995, Susan L. McGreevy, counsel for GAI and James Garrett, retained Donnelly, Meiners, Jordon, Kline, P.C. to serve as an expert for GAI, James Garrett and Oakview in the Glannon show cause proceeding.

On November 25, 1996, Reid Holbrook of Holbrook, Heaven & Osborn P.A., counsel for Oakview, made written demand that defendants and GAI reimburse Oakview for attorneys fees and costs incurred to date and for ongoing indemnification relating to other liabilities arising out of the Glannon bankruptcy. Holbrook specifically sought indemnification of $89,224.00 in attorneys' fees and expenses of $6,045.06 for Holbrook, Heaven & Fay,[4] and $15,-

---

3. The parties have stipulated that the conduct challenged in the malicious prosecution claim is the same as that challenged in the show cause proceeding, and that any differences between the two are not an issue in this case.

4. Holbrook, Heaven & Fay is the predecessor of Holbrook, Heaven & Osborn.

306.25 in attorneys' fees and $3,298.04 in expenses for Polsinelli, White, Vardeman & Shalton.

Around April 23, 1997, Glannon reached a settlement on his claims against various insurance companies, lawyers, law firms, etc.—not including his claims against defendants or GAI. As part of the agreement, however, the Garretts agreed to transfer GAI to Glannon. At the time of the transfer, GAI was subject to potential liability to Glannon both because of the show cause proceeding in the bankruptcy court and because of its agreement to indemnify Oakview for its participation in the bankruptcy proceeding.[5]

In July of 1997, Glannon initiated settlement negotiations with Oakview. As of July 1997, Glannon had pending claims against Oakview, GAI and Garrett for more than $1,100,000.00 in damages. Oakview faced liability in both the show cause proceeding in the bankruptcy court and Glannon's malicious prosecution suit. Under the indemnification agreement, GAI was potentially liable to Oakview for all costs, expenses, and attorneys' fees Oakview had incurred and would incur in those proceedings, including $130,000.00 in attorneys' fees at that time. On July 14, 1997, Glannon offered to settle and release his claims against Oakview for $150,000.00.

On September 30, 1997, Oakview settled its dispute with Glannon. As part of the settlement, Oakview released GAI (which Glannon now owned) from its obligation under the indemnity agreement. Neither GAI nor Glannon paid any separately designated funds for GAI's release.

Oakview incurred the following fees, costs and expenses as a result of its participation as a petitioning creditor in the involuntary bankruptcy proceeding against Glannon:

1. Attorneys' fees and expenses of Polsinelli, White, Vardeman & Shalton incurred to defend Oakview in the Glannon show cause proceeding—$15,421.21;

2. Attorneys' fees and expenses of Holbrook, Heaven & Osborn incurred to defend Oakview in the show cause proceeding and malicious prosecution case—$105,472.11;

3. Settlement with Glannon:

 a. Account balance waiver—$9,986.00

 b. Cash payment—$45,000;

4. Statutory prejudgment interest at 10 percent per annum;[6]

5. Attorneys' fees and expenses of Holbrook, Heaven & Osborn incurred to enforce the indemnification agreement—contingent fee of 40 percent of recovery[7]

Oakview filed the present action on April 10, 1998, seeking to recover amounts due under the indemnification agreement. Specifically, it seeks to recoup all attorneys' fees, costs and expenses which it incurred in defense of the show cause and malicious prosecution proceedings; the consideration which it paid to settle the Glannon claims; prejudgment interest; and the costs and attorneys' fees which it incurred in this collection proceeding. Oakview incurred the first of these costs on May 20, 1992, more than five years before it filed suit.

---

5. Also at that time, GAI had pending claims for legal malpractice against Myers, Ed Carpenter and the law firm of Carpenter, Wier & Myers. GAI thereby sought to recover the damages which *it* had incurred in the Glannon show cause proceeding, thus shifting the potential loss from Glannon to GAI to counsel.

6. Oakview seeks $62,629.50 in interest through April 1, 1999 and $48.76 per day

thereafter until judgment is entered. Defendants argue that the claims are not liquidated and that Oakview is not entitled to prejudgment interest.

7. Defendants stipulate that Oakview reasonably incurred these attorneys' fees and expenses as a result of its participation as a petitioning creditor in the involuntary bankruptcy proceeding, and that the 40 percent contingency fee is reasonable.

## Analysis

### A. Statute of Limitations

The Court first addresses defendants' argument that the five year statute of limitations, K.S.A. § 60–511(1), bars Oakview's breach of contract claim. Under Kansas law, the statute of limitations for breach of contract begins to run when defendants allegedly breached the contract. *See Voth v. Chrysler Motor Corp.*, 218 Kan. 644, 651, 545 P.2d 371 (1976); *Wolf v. Brungardt*, 215 Kan. 272, 279, 524 P.2d 726 (1974). A cause of action accrues when the right to institute and maintain a suit arises, or when there is a demand capable of present enforcement. *Holder v. Kansas Steel Built, Inc.*, 224 Kan. 406, 410, 582 P.2d 244, 248 (1978). There must be a right, a duty, and a default. *Edward Kraemer & Sons, Inc. v. City of Overland Park*, 19 Kan.App.2d 1087, 1091, 880 P.2d 789, 793 (1994).

Oakview first incurred costs and expenses under the indemnification agreement on May 20, 1992, and it incurred additional costs and expenses more than five years before it filed suit. Defendants argue that they are not liable for expenses incurred beyond the five year period, or for expenses incurred *within* the five year period, for that matter, because they absolutely repudiated the indemnification agreement on May 28, 1992, when their counsel told Oakview that "[n]either the Garretts personally nor Garrett & Associates, Inc. is obligated to indemnify and hold harmless Oakview for any action taken by Oakview before or concurrently with the joining of the involuntary petition." Defendants argue that Oakview's claim arose when it received this letter, because it then had notice that defendants did not intend to honor their agreement. Defendants contend that once plaintiff realizes that a defendant has no intention of honoring an agreement, the cause of action ac-

crues. *See Johnson v. Kansas Public Employees Retirement System*, 262 Kan. 185, 192, 935 P.2d 1049, 1054 (1997) (citing *Arnold v. S.J.L. of Kansas Corp.*, 249 Kan. 746, 822 P.2d 64 (1991)).

The Court disagrees that defendants' letter of May 28, 1992 constituted a breach of contract which commenced the running of the statute of limitations in this case. First, defendants' repudiation did not cover the entire indemnification agreement; at most, it covered costs and expenses incurred in the show cause proceeding and not other costs for which Oakview now seeks reimbursement. Second, no performance was due under the indemnification agreement until Oakview had incurred expenses and made demand for indemnification, or demanded that defendants assume its defense. Because the proceedings were ongoing and the total amount due was unliquidated; the amount due could not be ascertained until Oakview informed defendants of specific costs and expenses and sought performance. No cause of action for breach accrued until defendants refused a particular payment which had become due.

#### 1. Scope of the alleged repudiation

As noted above, defendants' repudiation, to the extent that it was a repudiation, did not cover the entire indemnification agreement; it specifically disclaimed liability for costs and expenses incurred in the show cause proceeding—which were the only expenses the parties contemplated in May 1992. At the time Oakview demanded performance on May 19, 1992, it had not incurred any costs or demanded reimbursement for specific expenditures. At most, defendants' letter of May 28, 1992 constituted an anticipatory repudiation of liability for expenses which Oakview had yet to incur in relation to the show cause proceedings.[8]

---

**8.** Defendants argue that the repudiation was not anticipatory because their duty to indemnify arose on May 4, 1992, when the bank-

ruptcy court ordered the show cause proceeding. The Court disagrees. Defendants' duty to reimburse costs could not arise until Oak-

■ Under Kansas law, in cases of anticipatory repudiation, plaintiff has three options: (1) bring an immediate suit for damages; (2) treat the contract as still binding and bring an action only after the time for performance by the promisor has passed; or (3) rescind the contract and sue for money paid or the value of services or property furnished. *Rupe v. Triton Oil & Gas Corp.*, 806 F.Supp. 1495, 1499 (D.Kan. 1992) (citing *Stauth v. Brown*, 241 Kan. 1, 734 P.2d 1063, Syl. ¶ 8 (1987)).[9] Both *Arnold* and *Johnson*, on which defendants rely, are distinguishable from the present case.

*Arnold* concerned a television station's agreement to promote plaintiff to the position of chief photographer when its current chief photographer left the news department. Plaintiff entered the employment agreement in 1978, based on the chief photographer's promise that he would step down in June of 1979. Plaintiff's employment agreement, however, did not include a specific time for the promotion. The chief photographer did not leave in 1979, but stayed until 1989. In 1980, the station was sold and the new management told plaintiff that it was not bound by the previous agreement. Plaintiff claimed that defendant breached the prior agreement, but the Kansas Supreme Court held that K.S.A. § 60–511 barred plaintiff's claim because he did not file suit within five years of when it became apparent that his employer was not going to honor the agreement. 249 Kan. at 751, 822 P.2d at 68.

*Johnson* concerned the loss of pension plan benefits. In 1974, the City of Manhattan and Riley County consolidated their law enforcement efforts. 262 Kan. at 185–86, 935 P.2d at 1050–51. As a result, in 1974, plaintiff employees stopped contributing to the city pension plan. In 1990, they filed suit to recover benefits they would have received if the city had not consolidated with the county. *Id.* at 191, 935 P.2d at 1053. The Kansas Supreme Court held that plaintiffs' cause of action arose in 1974, when the pension plan ended, because the city had become legally incapable of funding plaintiffs' benefits. *Id.* Once the pension plan ended, plaintiffs knew that they could not collect further benefits under the City plan. *Id.* at 192, 935 P.2d at 1054.

Both *Arnold* and *Johnson* fall within the rule stated in *Rupe:*

> [I]n Kansas, if a cause of action for anticipatory breach of contract is brought after the time set for performance, the action accrues on the date that such performance was due—unless the breach rendered future performance a legal or factual impossibility and the non-breaching party has fully performed.

*Rupe*, 806 F.Supp. at 1499. In *Arnold*, performance became factually impossible in 1980 when the promisor sold the television station. Plaintiff could no longer enforce the agreement against the contracting party and the new owner informed plaintiff that it was not bound by the agreement. The record does not suggest that the new owner had any obligation to honor the agreement, but plaintiff waited for nine years, until November of 1989, to file suit. In *Johnson*, performance was legally impossible because the original pension plan was terminated by statute.

---

view first incurred costs or demanded that defendants assume their duty to defend.

9. Oakview's letter of May 19, 1992 did not ask defendants to defend them in the show cause proceeding, but only demanded indemnification for costs and expenses to be incurred therein. Defendants argue that the letter broadly demanded that they perform "all other duties and obligations," which necessarily encompassed their duty to defend. At trial, however, Tom Busch, counsel for Oakview, testified that Oakview wanted separate counsel and did not want defendants to defend the show cause proceeding on their behalf. In any event, defendants' response to the letter of May 19, 1992 did not disclaim any duty to defend the show cause proceeding. Moreover, defendants' response had no occasion to address the malicious prosecution action, which Glannon had not yet filed.

In this case, defendants do not establish that performance was factually or legally impossible. Even if defendants' letter of May 28, 1992 was an anticipatory repudiation of certain contractual obligations, it was not impossible for defendants to rescind their partial repudiation and fully perform those obligations along with other, unrepudiated, obligations under the agreement.

In short, the Court finds that after May 28, 1992, Oakview was entitled to treat the agreement as still binding and bring suit only when the time for performance had passed. The Court must therefore determine when performance was due.

### 2. Due date for performance

Oakview argues that it made repeated oral demands for indemnification when it appeared through counsel at bankruptcy court proceedings; that the agreement required defendants to make payments under a continuing contract; and that a cause of action for breach did not accrue until defendants refused to make a payment which had become due. *See Rupe*, 806 F.Supp. at 1498. Oakview reasons that defendants' refusals to pay constituted separate breaches which commenced separate statute of limitations periods.

■ The indemnification agreement did not expressly state when defendants' performance was due. Kansas law holds that when a contract does not provide a time for performance or the occurrence of a necessary event, a reasonable time is implied. *Arnold*, 249 Kan. at 749, 822 P.2d at 67. Oakview therefore was required to demand payment within a reasonable time of incurring the costs and expenses. The Court agrees, however, that no performance was due until Oakview had incurred expenses and made demand for indemnification or demanded that defendants assume its defense. At the time the parties entered into the agreement, they did not know whether indemnification would be necessary. Even in May of 1992, the show cause proceedings were ongoing and Oak-

view's potential liability to Glannon was unliquidated. The total amount due under the indemnification agreement could not be ascertained, except with the passage of time and occurrence of certain events. Defendants could not discharge their obligations until Oakview told them what costs and expenses had been incurred. Consequently, no cause of action for breach accrued until defendants refused a particular payment which had become due.

■ Oakview's evidence, especially the testimony of it attorney Tom Busch, establishes that on various occasions Oakview made *general* requests for indemnification, orally. It made written requests in November 1996 and February 1998. The first request was by letter dated November 25, 1996, enumerating costs and expenses incurred through September 12, 1996. Oakview therefore waited more than four years before it requested payment of any specific costs. The parties do not address whether Oakview made it first specific demand within a reasonable time. For reasons stated below, however, the Court finds that in the circumstances of this case, Oakview did not unreasonably delay its formal demand for performance.

Even if Oakview waited an inordinate amount of time before making its first demand for payment, its delay was reasonable based on defendants' conduct. Busch testified that defendants responded to numerous oral requests for indemnification by silence or by stating that the parties "would talk about it later." In other words, they stonewalled. As noted above, even if the letter of May 28, 1992 constituted an anticipatory repudiation of defendants' obligation under the agreement, defendants were free to withdraw that repudiation before performance was due. *See Rupe*, 806 F.Supp. at 1500. When the letter is considered in light of the parties' discussions, the evidence shows that defendants were non-committal about their intent to honor or dishonor their duties under the agreement. Myers,

who wrote the letter of May 28, 1992, did not represent defendants during the show cause proceeding, and he apparently was not a party to the oral discussions about performance. Defendants' new counsel did not flatly reject Oakview's requests for indemnification, but instead chose to avoid the topic altogether. In addition, in 1995, defendants paid for an expert who testified on behalf of Oakview at the show cause proceeding, suggesting that they recognized their duties under the indemnification agreement. Based on the course of events, Oakview reasonably believed that defendants would perform their obligations at a later time, when all amounts due under the agreement had been liquidated. Oakview also reasonably believed that defendants did not want to address the issue before all amounts became liquidated.

Based on defendants' conduct, Oakview did not wait an unreasonable time before seeking performance by defendants. For this reason, the statute of limitations does not prevent Oakview from recovering costs and expenses incurred prior to April 10, 1993.

### B. Scope of the Indemnity Agreement

■ The indemnity agreement covers costs arising out of Oakview's participation as a petitioning creditor. "Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced. The intent of the parties is determined from the four corners of an unambiguous instrument, harmonizing the language therein if possible. Ambiguity does not appear ... [unless it is] genuinely uncertain which of two or more meanings is the proper meaning." *Neustrom v. Union Pacific Railroad Co.*, 156 F.3d 1057, 1063 (10th Cir.1998) (citing *Hall v. JFW, Inc.*, 20 Kan.App.2d 845, 893 P.2d 837, 840 (1995)). Because the agreement covers costs arising out of Oakview's participation in the involuntary petition, the agreement covers costs which are reasonably incident

to or anticipated by Oakview's involvement in the bankruptcy proceeding. *Missouri Pacific Railroad Co. v. Kansas Gas & Electric Co.*, 862 F.2d 796, 798 (10th Cir. 1988) (citing *Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1214 (5th Cir.1986)).

In this case, the indemnification agreement unambiguously covers those costs and expenses, and only those costs and expenses, arising out of Oakview's participation in the involuntary petition. The agreement does not create liability for costs and expenses that were wholly independent of the involuntary petition, but it does create liability for costs and expenses incurred by reason of Oakview's joinder in the involuntary petition. The parties do not appear to disagree about these fundamental matters of contract interpretation, but they disagree whether the agreement covers pre-petition conduct and if not, what acts or omissions constitute pre-petition conduct.

■ Defendants argue that Oakview essentially seeks to recover costs which it incurred as a result of its own conduct, prior to the bankruptcy proceeding, and that such costs are not covered by the indemnity agreement. The bankruptcy court found that before Oakview joined the bankruptcy proceeding, it had (1) failed to conduct a reasonable investigation into the letter from Glannon's counsel, warning that the bankruptcy had been filed for an improper purpose, advising that Glannon had defenses, and noting the consequences of joinder if the bankruptcy court found that the petition had been filed in bad faith; (2) violated the automatic stay of the Bankruptcy Code by trying to extract a payment from Glannon when the bankruptcy case was pending and the automatic stay was in effect; and (3) failed to bill Glannon for the debt on which it based its claim in the bankruptcy and had acquiesced in his attempts to have the debt paid by insurance. Defendants base their argument on the premise that the indemnity agreement does not cover pre-petition conduct and they argue that the bankrupt-

cy court relied solely on pre-petition conduct in finding bad faith by Oakview. In support of this argument, defendants note that both Oakview and Maxim joined the involuntary petition, but the bankruptcy court did not find that Maxim had acted in bad faith. Based on this fact, defendants argue that as a matter of law, neither Oakview nor Maxim joined the petition in bad faith.

The Court disagrees. First, to the extent that Oakview's bad faith in filing the bankruptcy petition is a defining issue, the question is whether Oakview joined the petition in bad faith and not whether the bankruptcy court so found. Moreover, the evidence suggests that the bankruptcy court did not rely solely on pre-petition actions in determining that Oakview had joined the bankruptcy petition in bad faith. Rather, it suggests that the bankruptcy court merely inferred from Oakview's prior conduct that it had joined the bankruptcy proceeding in bad faith. For example, the bankruptcy court did not find that Oakview acted in bad faith when it received the letter from Glannon's counsel. It instead found that Oakview had "joined [the petition] without reasonable investigation or inquiry in the face of this letter."

Defendants' argument that they did not assume liability for pre-petition conduct may have superficial appeal, because the indemnification agreement does not expressly assume liability for such costs. On the other hand, defendants solicited Oakview's participation in the bankruptcy petition, and their attorney drafted the indemnification agreement. If defendants intended to disclaim liability for Oakview's conduct before or concurrently with the joining of the involuntary petition, their broad contractual commitment was ill-suited to that purpose. Defendants therefore fail on both theories—*i.e.* that the bankruptcy court sanctioned Oakview for only pre-petition conduct and that the indemnification agreement does not reach pre-petition conduct.

In this regard, it is important to note that the indemnification agreement is a broad one. It provides indemnification for any and all costs, of whatever character, arising out of Oakview's participation as a petitioning creditor. In arguing that the bankruptcy court sanctioned Oakview for pre-petition conduct which falls outside the scope of the indemnification agreement, defendants ignore two crucial points. First, by concentrating their attention on the factual basis for the bankruptcy court's decision, they ignore the more salient point—that it predicated the sanctions order on Oakview's participation as a petitioning creditor. Second, defendants agreed to indemnify Oakview for any and all costs, of whatever character, arising from Oakview's participation as a petitioning creditor. On its face, such language does not preclude liability which indirectly flows from pre-petition conduct by Oakview.

Third, the record establishes that the bankruptcy court required Oakview to show cause exactly *because* it had chosen to participate in the bankruptcy proceeding, despite its prior actions such as an arguably insufficient investigation. Defendants cannot reasonably argue otherwise. The bankruptcy court retained jurisdiction over Oakview because it had joined the bankruptcy petition; otherwise, it could not have sanctioned Oakview as it did. *See* 11 U.S.C. § 303(i) (allowing expenses against petitioning party if involuntary petition is dismissed).

The Court is unpersuaded that the distinction between pre-petition and post-petition conduct provides a relevant analytical framework under the indemnification agreement in this case. When they drafted and executed the indemnification agreement, and solicited Oakview's joinder in the involuntary petition, defendants could reasonably anticipate that if the bankruptcy court were to later inquire whether Oakview joined the involuntary petition in bad faith, it would consider all relevant factors, pre-petition or post-petition, which

might reveal Oakview's state of mind based on information known by or available to it at the time of joinder. The bankruptcy court indeed sanctioned Oakview under 11 U.S.C. § 303(i), which allows expenses to be assessed against a petitioning creditor if an involuntary petition is dismissed. The factual analysis which yielded this holding may have encompassed pre-petition events. The sanctions which the bankruptcy court imposed nonetheless arose out of Oakview's participation as a petitioning creditor. The indemnification agreement therefore reaches all of the costs and expenses which Oakview incurred in the show cause proceeding; such obligations were both reasonably incident to and anticipated by Oakview's involvement in the involuntary petition.

## C. Offset Regarding GAI's Release

When Oakview settled with Glannon, it released GAI from liability under the indemnity agreement. GAI and defendants were co-obligors under the indemnity agreement, each being jointly and severally liable to Oakview for costs and expenses within the scope of the agreement. Under Kansas law, when two or more debtors are jointly and severally liable on an obligation, the release of one of the debtors discharges the obligation of the other debtor to the extent of the consideration paid for the release. *Bazine State Bank v. Pawnee Prod. Serv., Inc.,* 245 Kan. 490, 497–98, 781 P.2d 1077, 1083 (1989) (citing *Misco Leasing, Inc. v. Bush,* 208 Kan. 45, Syl. ¶ 1, 490 P.2d 367 (1971)).

Based on this rule, defendants argue that their liability under the agreement must be reduced to the extent of any consideration which Oakview received for the release of GAI.

This argument is tortured because GAI did not pay any consideration for its release and Oakview did not receive from Glannon or GAI any specified consideration for GAI's release. Defendants argue that Oakview nonetheless received value in return for GAI's release, and that the Court must offset that value from Oakview's claim against defendants. According to defendants,

> The value of Oakview's release of its indemnification claim against GAI is the amount of potential liability that Oakview avoided by settling Mr. Glannon's claims against it, less the other consideration paid to Mr. Glannon.... By releasing GAI in the settlement with Mr. Glannon, Oakview avoided the potential liability of more than $366,666. Therefore, the value of the release, combined with Oakview's payment of $45,000 and the release of Mr. Glannon's debt of $9,986, equals $366,666 making the value of the release equal to $311,680.

This argument is without merit. First, the record contains no evidence that Oakview had a potential liability to Glannon in the amount of $366,666.00.[10] Second, the record contains no evidence that Glannon provided consideration for GAI's release or

---

**10.** Glannon sought $1,100,000.00 in damages in the show cause and malicious prosecution proceedings, and the $366,666.00 figure represents one third of that potential liability. Defendants offer no clue why they believe that Oakview's potential liability is exactly one third of Glannon's prayer. They have not shown that the prayer represents a realistic measure of Glannon's damages, nor have they shown why precisely one third of it should have been born by Oakview when GAI, Oakview and all attorneys were equally liable.

Defendants may be alluding to the fact that they are two of the three obligors under the indemnity agreement. Even though they are

jointly and severally liable with GAI under the agreement, defendants contend that liability is properly allocated on a per capita basis so that each obligor is liable for no more and no less than one third of the obligation. Their theory may.be that Oakview had a $1,100,-000.00 potential liability to Glannon, but that $366,666.00 of that potential liability is deemed to have been discharged by the release of GAI since GAI was one of three obligors on the indemnification agreement. Defendants cite no legal authority for either position. The amount of Oakview's potential liability is irrelevant, however, and the Court need not address it further.

what its value might have been.[11]

On the facts of this case, defendants' argument is without merit. What Oakview received from the settlement with Glannon was a release from liability for costs and expenses for which *defendants* were ultimately liable under the indemnification agreement. If Oakview avoided any given liability, defendants likewise avoided that liability because Oakview thereby reduced their financial obligation under the indemnification agreement. Any expense to Oakview was an expense to defendants, and any value to Oakview was value to defendants. In this sense Oakview was nothing but a conduit for obligations that *defendants,* in the final analysis, owed Glannon.

Defendants are not entitled to an offset for consideration which Oakview received for GAI's release. Oakview's demand for indemnification has already been reduced to the extent of said value, and defendants have therefore already received any benefit to which they are entitled. Defendants correctly note that the purpose of an offset is to prevent a double recovery by Oakview. Under defendants' theory, Oakview will not receive a double recovery if an offset is denied; Oakview is still out of pocket all expenses and costs which it has incurred, and it has recouped none of them. If an offset is allowed, *defendants* will receive the double recovery; they have avoided potential liability on account of Oakview's settlement, and their exposure has been reduced accordingly. Their request for a second credit is denied.

### D. Oakview's Failure to Incur Any Costs

■ Defendants argue that Oakview is not entitled to damages because it has not incurred any costs. Specifically, defendants argue that Oakview did not pay any of the costs or expenses that it seeks to recover under the indemnification agreement. Defendants argue that the Mediplex Group, Inc. and Sun Healthcare Group, Inc., parent companies of Oakview, paid these expenses. Defendants' argument misstates the evidence. Defendants' argument is based on the fact that Oakview's name does not appear on actual payments made on its behalf. This does not mean that Oakview did not incur the costs. Nikki Mann, Oakview's corporate representative, testified that Oakview is a part of Sun Health and that Sun Health pays all expenses for its subsidiaries out of a central management account. Sun Health debits any expenses paid on behalf of Oakview. Payments to Oakview are credited to Oakview, not Sun Health. Therefore any expenses are debited from Oakview and it will receive any recovery.

Even if the Court adopts defendants' allegation that the parent companies incurred the expenses, defendants cannot prevail on this theory. Defendants cite *Lightcap v. Mobil Oil Corp.,* 221 Kan. 448, 463, 562 P.2d 1, 12 (1977), to support their argument that because the parent corporations paid the expenses, Oakview cannot bring the present action. Defendants cite *Lightcap* for the proposition that "[i]ndemnity against losses does not cover losses for which the indemnitee is not liable to a third person, and which he improperly pays." *Id.* (citing 41 Am.Jur.2d, Indemnity, § 33). Defendants' argument, however, twists the intent of *Lightcap.* The quoted phrase does not address the situation presented here, where defendants argue that merely because the parent corporations were not liable initially, Oakview

---

**11.** At trial, defendants argued that Glannon would have demanded a sum certain to settle his disputes with Oakview in a deal which did not release GAI; but that because Glannon was the sole owner of GAI and GAI was ultimately on the hook to reimburse Oakview for whatever it took to settle with Glannon, Glannon was willing to take less from Oak-view in a deal which released both him and GAI. Defendants argued that the difference between these two figures represented the consideration for GAI's release and that this amount should be set off against their obligation under the agreement. Defendants never proved, however, what these amounts might have been.

cannot recover the costs and expenses for which it is ultimately liable. *Lightcap* might be germane if Oakview was not liable to a third party, yet gratuitously decided to pay for no reason. Defendants' application of *Lightcap* strains credulity, and the Court does not address it further.

As Oakview notes, the fact that parent corporations paid the expenses initially does not mean that Oakview did not incur them. Indeed, even if the Court adopted defendants' theory and construed the evidence regarding Sun Health's central management account as constituting payments from Sun Health, Oakview would be obligated to repay any recovery to Sun Health because both expenses and payments go to the same central management account. Oakview is not recovering a windfall based on the payment system; it has incurred the costs and expenses that it seeks to recover.

**E. Attorneys' Fees**

 Oakview claims that it is entitled to recover attorneys' fees totaling 40 percent of its recovery in this suit on the indemnification agreement. Defendants stipulate that 40 percent is a reasonable fee, but argue that the indemnification agreement does not cover such costs. Under Kansas law, the prevailing party in a lawsuit may recover attorneys' fees where the fees are specifically authorized by statute or contract. *Missouri Pacific,* 862 F.2d at 801 (citing *Farmers Casualty Co. v. Green,* 390 F.2d 188, 192 (10th Cir.1968); *Oak Park Inv. Co. v. Lundy's, Inc.,* 6 Kan.App.2d 133, 626 P.2d 1236, 1237 (1981)). Under the express terms of the agreement, defendants agreed to indemnify Oakview for "any and all claims, demands, liabilities, and costs arising from

damage or injury, actual or claimed, of whatever kind or character." The agreement also provided that "[u]pon notice from Indemnitee, the undersigned shall defend the Indemnitee in any action or proceeding brought thereon, including all attorney's fees and expenses ...." The last phrase clearly covers attorneys' fees. *See Neustrom,* 156 F.3d at 1068.

Even if the Court were to ignore the latter phrase and look only to the first phrase, the Court finds that it is sufficiently broad to allow recovery of attorneys' fees in this case. Defendants argue that *Missouri Pacific* allowed attorneys' fees only because the agreement expressly included such fees. *See* 862 F.2d at 797. The Court disagrees. In discussing whether the agreement covered attorneys' fees, the Tenth Circuit in *Missouri Pacific* focused on the general terms of the agreement which allowed recovery of all damages, costs and fees. *Id.* at 801. The Court did not mention the express attorneys' fee clause, and it relied upon a case which allowed attorneys' fees under the phrase "any and all loss, cost, damage and expense" with no other mention of attorneys' fees. *Id.* (citing *Brown v. Seaboard Coast Line R.R. Co.,* 554 F.2d 1299, 1304 (5th Cir.), *cert. denied,* 434 U.S. 975, 98 S.Ct. 533, 54 L.Ed.2d 467 (1977)). Oakview is therefore entitled to recover an attorneys' fee of 40 percent of its recovery here.

**F. Prejudgment Interest**

 Under K.S.A. § 16–201, Oakview also seeks to recover prejudgment interest of 10 percent per annum on costs, expenses, and attorneys' fees incurred in the show cause proceeding and malicious prosecution proceeding.[12] The allowance

---

12. Section 16–201 provides

Creditors shall be allowed to receive interest at the rate of ten percent per annum, when no other rate of interest is agreed upon, for any money after it becomes due; for money lent or money due on settlement of account, from the day of liquidating the account and ascertaining the balance; for

money received for the use of another and retained without the owner's knowledge of the receipt; for money due and withheld by an unreasonable and vexatious delay of payment or settlement of accounts; for all other money due and to become due for the forbearance of payment whereof an express promise to pay interest has been made; and

of prejudgment interest under K.S.A. § 16–201 is a matter of judicial discretion. *Miller v. Botwin,* 258 Kan. 108, 118, 899 P.2d 1004, 1011 (1995). The general rule in Kansas is that prejudgment interest is allowable on liquidated claims. A claim becomes liquidated when both the amount due and the date on which it is due are fixed and certain, or when the same becomes definitely ascertainable by mathematical computation. *Hamilton v. State Farm Fire and Cas. Co.,* 263 Kan. 875, 883, 953 P.2d 1027, 1033 (1998). Where an amount is due upon contract, either express or implied, and there is no uncertainty as to the amount which is due or the date on which it becomes due, the creditor is entitled to recover interest from the due date. *See Neustrom,* 156 F.3d at 1067.

■ Defendants argue that Oakview's claim is not liquidated because the Court has yet to determine whether the damages Oakview seeks are reasonable. Defendants' argument is without merit. First, the issue of reasonableness does not make a claim unliquidated. *See Neustrom,* 156 F.3d at 1067; *Missouri Pacific,* 862 F.2d at 801. Second, defendants have stipulated that the attorneys' fees and expenses which Oakview seeks to recover are reasonable. The only issue which remains is for the Court to determine the reasonableness of the settlement. For a settlement to be reasonable, Oakview need only show that it was potentially liable and that the settlement amount was reasonably related to Glannon's injuries. *Neustrom,* 156 F.3d at 1067. Oakview has met this burden. The evidence establishes Oakview's potential liability to Glannon, and the evidence suggests that Oakview entered the settlement in good faith for an amount that compensated Glannon for his injuries while allowing Oakview to avoid potential liability. Defendants do not provide any logical reason why the settlement is not reasonable.

■ Defendants also argue that Oakview is not entitled to prejudgment interest because the parties have disputed what costs are covered by the indemnity agreement. Defendants argue that none of Oakview's·costs are covered; Oakview argues that all of its costs are covered. Neither party argues that only some costs incurred by Oakview are covered; the parties only dispute defendants' liability. When the dispute concerns only liability, it does not prevent the claims from being liquidated. *See Missouri Pacific,* 862 F.2d at 801; *Miller,* 258 Kan. at 118, 899 P.2d at 1012 (citing *Crawford v. Prudential Ins. Co.,* 245 Kan. 724, 737, 783 P.2d 900, 909 (1989)). Therefore, the existence of the present action does not prevent Oakview from recovering prejudgment interest.

Defendants finally argue that Oakview's claims are not liquidated because GAI is potentially liable to Oakview and because the Court must offset the value of GAI's release from Oakview's claim against defendants. Both of these arguments lack merit. Defendants fail to show how GAI is potentially liable to Oakview; Oakview has released GAI from its obligations under the indemnification agreement. Moreover, as previously discussed, defendants are not entitled to any offset for the value of GAI's release.

■ The Court must still determine when Oakview's claims became liquidated. The Court finds that some of Oakview's claims became liquidated on November 25, 1996, when Oakview sought indemnification of $89,224.00 in attorneys' fees and expenses of $6,045.06 for Holbrook, Heaven & Fay, and $15,306.25 in attorneys' fees and $3,298.04 in costs to Polsinelli, White, Vardeman & Shalton. Prior to this date, Oakview did not demand payment of any specific costs, and no payment was yet due. The letter of November 25, 1996, however, triggered defendants' duty to indemnify Oakview for costs incurred through September 12, 1996. Because de-

for money due from corporations and individuals to their daily or monthly employees,

from and after the end of each month, unless paid within fifteen days thereafter.

fendants' payment was then due for the listed expenses, Oakview's claim for these expenses was then liquidated. *See Hamilton*, 263 Kan. at 883, 953 P.2d at 1033.

The Court recognizes that other courts have found that claims were liquidated on the date that the indemnitee incurred the expenses. *See Federal Land Bank v. Vann*, 20 Kan.App.2d 635, 642, 890 P.2d 1242, 1247 (1995) (claim under indemnity agreement liquidated from date plaintiff made payment to third party); *Neustrom*, 156 F.3d at 1067; *Missouri Pacific*, 862 F.2d at 801. These cases are distinguishable, however, from this case. In each of the other cases, the indemnitor's duty to perform had already arisen. In *Neustrom*, the express provisions of the indemnity agreement provided that the indemnitor's duties arose immediately when the indemnitee injured a third party. *Id.* at 1061. In addition, before the indemnitee settled with the injured party, the court had determined that the indemnity agreement covered the case. 156 F.3d at 1061. In *Missouri Pacific*, the indemnitee requested that the indemnitor perform on its duty to defend and the indemnitor refused. 862 F.2d at 801. After this refusal, the indemnitee settled the lawsuit and sought damages for the indemnitor's breach of the agreement. *Id.* Similarly, in *Vann*, the court created an implied indemnification agreement based upon a divorce decree between defendant and plaintiff, his ex-wife. Prior to the divorce, the couple had obtained a mortgage for which they were jointly and severally liable. 20 Kan. App.2d at 636, 890 P.2d at 1244. In the divorce, defendant received the real estate covered by the mortgage, as well as the obligations under the mortgage. Defendant defaulted on the mortgage. The mortgagor brought an action against both plaintiff and defendant and received a deficiency judgment. Plaintiff made payments on the deficiency judgment but sought reimbursement from defendant based on the divorce decree. The Court held that plaintiff's claims were liquidated once she made payments to the mortgagor.

In all three cases, the indemnitor's duty to perform had arisen and the indemnitor had already breached his duty before the indemnitee made the payments. Such is not the case here; defendants' duty to perform did not arise until Oakview demanded payment for its costs and expenses. In this case, the agreement did not set forth any date when defendants' duty to perform began. Oakview did not enforce the agreement prior to settling with Glannon. Oakview did not invoke defendants' duty to defend; it expressly chose to retain separate counsel and seek reimbursement for these costs.

While Oakview argues that each expense became liquidated when Oakview paid it, the Court is not persuaded. Oakview could have invoked defendants' duty to defend and avoided all of the costs and expenses for which it now seeks reimbursement. Instead, Oakview intentionally decided to rely on defendants' duty to reimburse costs and expenses—a duty which did not arise until Oakview incurred costs and expenses and then made demand for reimbursement. Oakview now seeks to recover 10 percent per year on 1992 expenses which defendants did not learn of until November 25, 1996, four and one half years later. Allowing prejudgment interest on these expenses would be patently unfair to defendants. Because defendants' duty to perform did not arise until Oakview demanded reimbursement for the costs which it incurred, Oakview's claim for expenses through September 12, 1996 did not become liquidated until November 25, 1996.

The record contains no evidence that Oakview specifically demanded payment of any remaining costs or expenses between November 25, 1996 and the date on which it filed suit. Therefore the remaining costs and expenses were not liquidated until plaintiff brought suit on April 10, 1998.

The Court finds that Oakview is entitled to the following prejudgment interest:

$29,930.38 for Oakview's claims which became liquidated on November 25, 1996, and $7,475.60 for Oakview's claims which became liquidated on April 10, 1998.[13]

**IT IS THEREFORE ORDERED** that based on the above discussion, Oakview is entitled to the following amount in the present action:

1. Attorneys' fees and expenses of Polsinelli, White, Vardeman & Shalton incurred to defend Oakview in the Glannon show cause proceeding—$15,421.21;

2. Attorneys' fees and expenses of Holbrook, Heaven & Osborn incurred to defend Oakview in the show cause proceeding and malicious prosecution case—$105,472.11;

3. Settlement with Glannon:

 a. Account balance waiver—$9,986.00

 b. Cash payment—$45,000;

4. Statutory prejudgment interest$37,405.98;

 Subtotal–$213,285.30

5. Attorneys' fees and expenses of Holbrook, Heaven & Osborn incurred to enforce the indemnification agreement—contingent fee of 40 percent of recovery ($213,285.30)—$85,314.12

**Total–$298,599.42**

The Clerk is directed to enter judgment accordingly.

---

**13.** The Court uses the formula agreed upon by the parties. For example, Oakview's November 25, 1996 expenses total $113,873.35. Multiplying this by 10 percent yields interest of $11,387.35 per year. Dividing this by 365 days, Oakview is entitled to $31.20 per day. From November 25, 1996 through June 23, 1999, 959 days have passed. Multiplying $31.20 by 959, the Court arrives at $29,930.38. The Court reaches a different amount in prejudgment interest than Oakview because it finds that the claims became liquidated on different dates than Oakview argued.